***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and the subject matter.
2. The carrier on the risk at the time of the alleged injuries was EMC Insurance Companies.
3. Defendant-employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act.
4. An employer-employee relationship existed between defendant-employer and plaintiff on December 21, 2004, the date of the injury.
5. After the hearing before the Deputy Commissioner, the parties stipulated to an average weekly wage of $676.51, which yields a compensation rate of $451.01.
6. Plaintiff has not worked for defendant-employer from March 10, 2007 to the present and continuing.
7. A Pre-Trial Agreement was accepted and made part of the record and was marked as Stipulated Exhibit 1.
8. A set of documents containing medical records, Industrial Commission forms, rehabilitation records, a printout of all medical bills paid on behalf of plaintiff and surveillance reports was designated as Stipulated Exhibit 2.
9. The issues before the Commission are whether plaintiff has been disabled as the result of his injury by accident from March 10, 2007 to the present and continuing; if not, whether plaintiff is entitled to any further disability or medical compensation; and, whether the Commission should authorize Dr. Volin, Dr. Gala, Dr. Thompson and/or Dr. Blankenship as plaintiff's treating physicians. *Page 3 
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 32 years old. Plaintiff is six feet six inches tall and weighs over 300 pounds.
2. Plaintiff graduated from high school and attended Fayetteville Technical Community College to study funeral service education but did not finish the course or obtain a degree or certification. Instead, plaintiff worked primarily as a truck driver, equipment operator and grocery store stocker prior to accepting a position with defendant-employer.
3. Prior to December 2004, plaintiff never had balance, speech, unusual anger or temper problems.
4. Plaintiff began working for defendant-employer in February 2004. Defendant-employer works on municipal water and sewer systems repairing pumps and drilling wells in North Carolina, South Carolina, Virginia and Tennessee.
5. While working for defendant-employer, from February to December 2004, plaintiff mainly worked with Ronald Patterson on well rigs. Plaintiff's duties included loosening bolts, running the crane and rigging pumps. His work required extensive use of the shovel and working underground.
6. Plaintiff had a commercial driver's license until December 2004. Plaintiff used his commercial driver's license to drive the drill rig, the dump truck and the cranes involved in his work. He has not been able to use his commercial driver's license at any time after December 21, 2004. *Page 4 
7. Plaintiff was paid $13.25 per hour by defendant-employer. Health insurance and other benefits were provided to him. Prior to December 2004 plaintiff had a good attendance record and had never been "written up."
8. On December 21, 2004, plaintiff and Ryan Townsend were working at Gaster's Creek in Sanford, North Carolina, on a sewer lift station. After they had taken out the bolts to change an actuator valve, the valve spun around and hit plaintiff on the left side of his head. This was the first time plaintiff had worked with an actuator valve. The actuator valve was about as big as a small fire extinguisher with a small needle valve on the end. The valve was under pressure and struck plaintiff's left temple with tremendous force. The needle valve pierced the bill of plaintiff's hat and lacerated his head.
9. Immediately after the accident plaintiff was taken to Central Carolina Hospital's Emergency Department where the laceration was treated. Plaintiff complained of headaches, some blurred vision and a burning sensation on his head where he was hit by the valve top. A CT scan of the head was performed and showed no evidence of a midline shift, mass effect, or intra-cerebral hemorrhage, and the intra-cerebral structures appeared normal for plaintiff's age. Plaintiff was discharged with a diagnosis of a laceration and concussion, was prescribed pain medication, and was given a follow-up appointment for January 4, 2005.
10. Plaintiff was stunned by the blow to his head and does not remember much about the events surrounding his injury or when approximately plaintiff's memory returned to normal.
11. Immediately after his accident, plaintiff began to develop problems with his balance and speech. His wife had to help him walk and his speech became very slow and labored. His vision was blurred. Plaintiff also began to experience headaches that continued to the date of the hearing before the Deputy Commissioner. *Page 5 
12. Plaintiff returned to the Emergency Department of Central Carolina Hospital on December 30, 2004, presenting with symptoms of photophobia and reports of slurred speech and weakness. Another CT scan of the head was done and was read as normal. Plaintiff was discharged.
13. On January 5, 2005, plaintiff underwent a neurological evaluation by Dr. Rebecca Tat, a neurologist in Fayetteville. Dr. Tat prescribed medication for "post-concussive syndrome" and referred plaintiff for an MRI of the brain and to physical therapy for gait and balance training.
14. On January 19, 2005, plaintiff saw Dr. Rakesh Parikh, who is board certified in physical medicine and rehabilitation. Plaintiff was very impulsive, frustrated and angry. Plaintiff's wife informed Dr. Parikh that this behavior was not normal for plaintiff. Dr. Parikh diagnosed "post-concussive syndrome, severe."
15. The following day, plaintiff was admitted into the Southeastern Regional Rehabilitation Center (Southeastern) in Fayetteville where he received physical therapy, occupational therapy, recreational therapy and psychological services. The history and physical examination notes from his admission at Southeastern state that plaintiff had been "impulsive with bursts of anger off and on and has severe irritability, headache, with impaired coordination, as well as impaired sexual function." Plaintiff was also treated with various medications. An MRI of the brain on January 29, 2005 was normal. Plaintiff was in Southeastern from January 20, 2005 to February 4, 2005. The rehabilitation was successful in that when he left, plaintiff was able to walk with a cane and his speech was improved.
16. Upon his release from Southeastern, Dr. Parikh diagnosed plaintiff with both post-concussion syndrome and conversion reaction. Conversion reaction is a psychological *Page 6 
disorder in which a patient behaves as if he has a condition for which there is no physical evidence. This is not intentional behavior. The conversion disorder diagnosis came in part from the psychological evaluation at Southeastern. Plaintiff had significant dysarthria, which is a difficulty in communication, as well as dizziness, impaired coordination, and bladder and bowel urgency.
17. Following his discharge from inpatient treatment at Southeastern, plaintiff was treated by Dr. Edward Crane, a psychologist. Dr. Crane treated plaintiff with biofeedback and psychotherapy.
18. On February 15, 2005, plaintiff convinced Dr. Parikh to allow him to return to work light duty. As early as February 15, 2005, Dr. Parikh was worried that the stress of driving could cause plaintiff's anger outbursts.
19. Plaintiff initially returned to work part time for three to four months. Instead of working in the field as he had done prior to his injury, he was sent to work in the shop and warehouse. He performed light duties such as cleaning and cataloguing tools. Plaintiff carried around a notebook to help him remember to do things, which he did not do prior to December 21, 2004.
20. On March 7, 2005, Dr. Tat saw plaintiff again, noted that he had a normal neurological examination, and concurred with the diagnosis of a conversion disorder. Dr. Tat prescribed an anti-depressant to help with plaintiff's reported anxiety and mood swings.
21. The medical records show that plaintiff often gave Dr. Parikh a more positive view of his situation than he would give other physicians on the same day or same week. For instance, on March 28, 2005, plaintiff and his wife had no complaints when visiting Dr. Parikh, *Page 7 
but on the same day he told Family Nurse Practitioner Cynthia Julich that he was still having headaches and that his anxiety was increasing.
22. On April 15, 2005, Dr. Parikh observed plaintiff's frustration and anxiety during his office visit. Plaintiff's wife verified a history of anger outbursts. Even the nurse case manager verified that plaintiff was having anger outbursts, short-term memory loss, delayed processing and impaired judgment.
23. When Dr. Parikh wrote on April 20, 2005 that plaintiff's conversion reaction had "resolved," he was only referring to speech and balance issues and not to plaintiff's anger outbursts. In a May 2, 2005 note, Dr. Parikh wrote that plaintiff's traumatic brain injury had caused his conversion reaction.
24. Plaintiff continued under the care of Dr. Parikh, who treated plaintiff with medication for anxiety. Plaintiff responded well to the medications, although he continued to complain of occasional anger outbursts. On May 17, 2005, Dr. Parikh noted that plaintiff had been doing fine generally, until early May when he had an episode of yelling and uncontrollable anger towards other staff and family members. Dr. Parikh noted that plaintiff apparently regained his strength and communication, that there were no tremors, and that plaintiff's balance had improved. Dr. Parikh felt plaintiff's goals were complete and referred plaintiff for a functional capacity evaluation (FCE).
25. On July 13, 2005, plaintiff performed a FCE with Elizabeth Barefoot in Fayetteville. The test results showed that plaintiff gave his best effort and the results were valid. The evaluation indicated that plaintiff was able to work at the very heavy physical demand level.
26. Dr. Parikh saw plaintiff in follow up on July 22, 2005. At that time, plaintiff had been working light duty for defendant-employer in the warehouse. Plaintiff had no complaints *Page 8 
when he saw Dr. Parikh that day. Plaintiff reported that his headaches were better, his mood was better, and that he had no weakness. Dr. Parikh was of the impression that plaintiff's conversion reaction had resolved and he released him to return to regular duties, except for driving. Dr. Parikh also referred plaintiff for a driving evaluation.
27. On September 1, 2005, Dr. Parikh examined plaintiff for the last time, noting that plaintiff stated that he did not have any headaches or nausea, and was independent in all aspects of his activities and mobility. Plaintiff denied having any weakness or numbness. During the physical examination, plaintiff was fully oriented, very pleasant and cooperative, and was able to consistently obey multi-step commands. The neurological examination was negative. Dr. Parikh felt plaintiff had reached maximum medical improvement, was able to drive any vehicle or operate any machine, had sustained zero percent disability, and discharged him from care. This discharge was for plaintiff's physical problems, not his psychiatric problems. In his deposition, Dr. Parikh testified that plaintiff's anger outbursts were not part of the conversion reaction, but were part of his concussion syndrome.
28. Plaintiff also treated with Dr. Thomas Wilson, a psychiatrist in Sanford, who treated plaintiff with medication. Plaintiff also had psychotherapy with Rodney Jones, a social worker. On May 11, 2005, Dr. Wilson prescribed Depakote for potential episodes of seizure activity after plaintiff's wife reported that plaintiff would sometimes stare off into space. Plaintiff also reported episodes of agitation and angry outbursts. Plaintiff continued on Depakote, which seemed to improve his irritability. On June 28, 2005, plaintiff reported to Mr. Jones, that he was "more like my old self." As of November 17, 2005, plaintiff had reached maximum medical improvement from a psychological standpoint and was released to return *Page 9 
every three months. Plaintiff indicated on that date that things were going well at work and home and things were almost back to normal.
29. During all periods when plaintiff was out of work in 2005, including periods of both temporary total and temporary partial disability, defendant-employer continued to pay plaintiff his full wages. Defendant-employer also continued to pay plaintiff's health insurance to the date of the hearing before the Deputy Commissioner.
30. After Dr. Parikh released plaintiff to work full time, plaintiff gradually began to work in the field again, doing water and sewer system plant work primarily with Ted Hart. In order to accommodate the plaintiff's limitations, Mr. Hart performed many of the tasks that plaintiff could not do, such as climbing ladders, working at heights, or balancing on a piece of pipe. Despite what plaintiff had told Dr. Parikh, his balance had not returned completely. Once, while working at a lift station, plaintiff's co-workers tied a rope around plaintiff and tied the other end of the rope to the back of the pick up truck to prevent him from falling into a hole in case he lost his balance. Plaintiff never had to receive special assistance from co-workers for any tasks prior to December 2004.
31. Plaintiff went from February 6, 2006 to June 22, 2006 without seeing any doctors for his head injury. He explained that he was "trying to do what I could do on my own, and trying to adjust the best way I could." He continued to take his medications during that time period. When plaintiff's wife left him in June 2006 because of his temper outbursts, he went to his family nurse practitioner, Ms. Julich, who prescribed medication and then referred him on to UNC Chapel Hill for more specialized treatment.
32. Plaintiff was last seen by Mr. Jones on June 26, 2006, at which time plaintiff indicated he was able to manage aggravating factors without incident. Plaintiff also reported to *Page 10 
the nurse case manager, Ernestine Carthon, that things were going better and he was no longer having difficulties with his previous supervisor in the warehouse. As of that date, plaintiff was separated from his wife, but nevertheless reported that things were going well at home. Ms. Carthon's report of September 5, 2006, noted plaintiff had worked through the month of August doing his usual duties without any difficulties.
33. Shortly after having his care transferred to Ms. Julich for monitoring blood levels, plaintiff was referred to the University of North Carolina Hospital because plaintiff told Ms. Julich he wanted to be weaned from his current medications. Plaintiff reported that he felt his medications were contributing to other concerns, such as weight gain, elevated blood pressure at times, and family separation.
34. On August 17, 2006, plaintiff was seen by Dr. Albert Hinn in the Neurology Department of the University of North Carolina Hospital. The clinic note indicates that plaintiff's wife was present at that evaluation and related a history of plaintiff's outbursts. Plaintiff told Dr. Hinn that he was not aware of what occurred during this time. During the physical examination, Dr. Hinn noted that some of plaintiff's effort was "questionable." Dr. Hinn recommended video EEG monitoring to determine whether plaintiff had any seizures and requested plaintiff obtain all previous EEG or brain imaging studies.
35. Dr. Jill Volin, a resident in psychiatry at UNC Chapel Hill, first saw plaintiff on September 13, 2006 as part of a psychiatric consultation in conjunction with her teaching professor, Dr. Gala. The purpose of the consultation was to evaluate plaintiff for any psychiatric component to his violent outbursts. He had hit a stranger prior to his evaluation. When plaintiff was first evaluated at the UNC Department of Psychiatry, he had been having episodes of violence and rage and was depressed and having daily crying spells. He was having cognitive, *Page 11 
concentration and short term memory problems. During this evaluation, plaintiff stated that he had a depressed mood and had fleeting thoughts two weeks ago that he would be better off dead. Plaintiff recounted having thoughts of his own death and of watching others get murdered. Plaintiff also reported not performing well at work, having gait instability, and problems with fine motor control since the accident. Plaintiff reported that the Depakote had lost its effectiveness, although plaintiff made no attempt to return to Dr. Wilson or Mr. Jones.
36. Drs. Gala and Volin believed that plaintiff had behavioral dyscontrol disorder, which is a cluster of symptoms characterized primarily by episodes of rage but also by disturbances of mood and cognition and intermittent, uncontrollable outbursts of mood or behavior. Drs. Gala and Volin also believed that the behavioral dyscontrol disorder was caused by plaintiff's traumatic brain injury of December 21, 2004. Plaintiff's behavioral dyscontrol disorder was described as "severe" because he had impairments in almost every area of his life, including social, emotional and occupational. Drs. Volin and Gala referred plaintiff to the UNC Traumatic Brain Injury Clinic to be treated by Dr. Lisa Blankenship, a physiatrist, and Karen Thompson, Ph.D., a neuropsychologist. Dr. Volin prescribed an anti-depressant medication, Celexa, which is also used in controlling emotional outbursts. When plaintiff saw Dr. Volin again on October 3, 2006, he had experienced "only" three violent episodes since his prior visit, which was considered an improvement. While his mood, sleep, nightmares and crying spells had improved, plaintiff experienced no real change in the disturbing and intrusive thoughts of murder. The physicians increased the Celexa and referred plaintiff to a support group for traumatic brain injury patients run by Dr. Thompson.
37. Plaintiff was evaluated by Dr. Blankenship. During his physical examination, Dr. Blankenship found that plaintiff had normal strength in his arms and legs with normal equal and *Page 12 
symmetrical deep tendon reflexes. Plaintiff reported some subjective reduced sensation in the left arm and leg but not any particular dermatomal pattern. Plaintiff complained of dizziness with certain movements. Dr. Blankenship referred plaintiff for physical therapy to assist him with his reported balance difficulties and dizziness. Thereafter, plaintiff underwent physical therapy, during which plaintiff complained to the therapists of substantial balance problems.
38. On December 15, 2006, plaintiff made an emergency visit to the UNC psychiatry clinic where he was seen by Dr. Julia Knerr. Plaintiff's temper had gone out of control when he ran out of his Celexa. He had pulled a co-worker off a forklift and had to be restrained by other co-workers. Plaintiff's wife added that he had become unable to tolerate much noise or stress and had become very angry, hitting and punching things. It was also the opinion of Dr. Knerr that plaintiff's uncontrollable anger outbursts were a result of his brain injury in December 2004.
39. Plaintiff also complained of vision difficulties and on January 11, 2007, was seen for a neuro-ophthalmology examination by Dr. Synee Givre. Plaintiff told Dr. Givre that he had difficulty looking at one thing for a long time and that when he did, things became jumbled. After his evaluation, Dr. Givre found no evidence to explain plaintiff's alleged symptoms.
40. Plaintiff returned to Drs. Volin and Gala on January 22, 2007. Although he claimed to have improved since increasing his Celexa dosage, plaintiff reluctantly admitted to slapping a co-worker approximately two weeks prior. He did not know whether his supervisors knew of that event. The angry outbursts seemed to be less frequent with the increased Celexa dosage. Dr. Volin explained to plaintiff that if he did not learn to control his anger better, he might have to go on disability. *Page 13 
41. On January 23, 2007, plaintiff was administered a number of neuropsychological tests by Dr. Thompson. Dr. Thompson noted that plaintiff failed to give adequate effort on the tests and felt that plaintiff had psychological issues. Thereafter, she provided therapy to plaintiff.
42. On January 30, 2007, plaintiff told his physical therapist that he had lost his balance while walking across a catwalk and had fallen into a pipe. Because of plaintiff's recounting of that incident, the therapist felt that plaintiff's working over various surfaces and narrow walkways was unsafe. On February 15, 2007, Dr. Blankenship noted that plaintiff had been assigned to the warehouse, but that things were not going well. Plaintiff said he had difficulty working with others and had "outbursts at work." For his balance problems, Dr. Blankenship felt plaintiff should continue on work restrictions of no climbing, no working at heights, and avoiding field work.
43. On February 26, 2007, plaintiff returned to the psychiatry clinic to meet with Drs. Gala and Volin. Plaintiff continued to experience angry outbursts since their last meeting and had been written up at work because of those outbursts. Plaintiff was experiencing anxiety about losing his job as a result of the angry outbursts. It was the opinion of both Dr. Gala and Dr. Volin that plaintiff would struggle with his anger outbursts for the rest of his life.
44. On March 6, 2007, while working in the warehouse, plaintiff reported to his supervisor that he may have lost consciousness and that he fell to the floor. He only remembered getting off the floor and having a difficult time regaining his balance. Other employees helped plaintiff to the truck and took him to the hospital. At the same time, plaintiff's speech slowed dramatically as he had a difficult time finding words. His headaches also got worse.
45. At the hospital, another CT scan of the head was performed and again was read as negative. An MRI of the brain was performed the next day and was also negative. The *Page 14 
physician who treated plaintiff, Dr. Christopher Wood, noted that plaintiff's grip strength in the left hand revealed possible weakness, but that he was not sure that plaintiff was gripping as tightly as he could. There was no evidence of a stroke or brain injury and Dr. Wood had no explanation for plaintiff's alleged blackout. The discharge notes indicated that the differential diagnosis would be a possible conversion disorder or malingering. Dr. Wood also noted that plaintiff's symptoms waxed and waned during his stay, and assessed plaintiff with a "borderline personality disorder."
46. Plaintiff went back to the Physical Medicine and Rehabilitation Department at UNC and was seen in March 2007 by Dr. Julia Bryson, who felt plaintiff had some increased reflexes and ordered another CT scan, which was also reported as normal. Subsequently, Dr. Blankenship examined plaintiff, noting that it was difficult to determine how much weakness plaintiff had on his left side because there was a significant "give way." Plaintiff told Dr. Blankenship that his speech was better than it had been. Dr. Blankenship was unclear about the cause of plaintiff's recent episode. As a result of plaintiff's syncopal episode in early March, Dr. Blankenship discontinued Celexa. When plaintiff stopped taking Celexa, his angry outbursts markedly increased. Dr. Blankenship then wrote plaintiff out of work secondary to these angry outbursts, gait instability and speech and vision difficulties.
47. Plaintiff underwent another EEG on March 20, 2007, which showed no evidence of any seizure or epileptic type of activity. On the same day, plaintiff was at physical therapy where his speech was characterized as "halting." When instructed to touch his finger to his nose, plaintiff "over shot" the nose on the left and the right. Plaintiff's gait was not normal. However, when the therapist observed plaintiff leaving and he was not aware she was watching, he *Page 15 
ambulated quickly with his walker and his gait was normal. The therapist felt there had been some inconsistency in plaintiff's presentation that day.
48. Following the March 6, 2007 syncopal incident, Dr. Volin described plaintiff's speech as unusually slow and halting. This condition is called dysarthria.
49. Following plaintiff's syncopal incident on March 6, 2007, he experienced extreme difficulty with gait instability and dysarthria. After Dr. Blankenship failed to find a physical cause for these symptoms, Drs. Gala and Volin diagnosed conversion disorder. Plaintiff's primary stressor causing the conversion disorder was his anger outbursts.
50. By March 28, 2007, Drs. Thompson, Blankenship, Gala and Volin all agreed that plaintiff should seek Social Security disability, believing that he was totally disabled from competitive employment as a result of his traumatic brain injury.
51. Plaintiff was seen by Dr. Volin and attending psychiatrist Dr. Bradley Gaynes on April 19, 2007. Dr. Gaynes agreed that plaintiff's behavioral dyscontrol disorder was caused by his traumatic brain injury.
52. Plaintiff's doctors took him out of work because he was a danger to himself and others due to his angry outbursts. They also feared that he could be prosecuted criminally if he assaulted someone again.
53. At defendants' request, plaintiff was seen by Dr. Thomas Gualtieri, a neuropsychiatrist in Chapel Hill, on May 21, 2007. Plaintiff complained of headaches, blurred vision, dizziness, and irritability and explosive outbursts, all of which he stated occurred after the 2004 accident. Dr. Gualtieri took a history from plaintiff and conducted a review of the medical records. Dr. Gualtieri administered several tests and performed a physical examination. Plaintiff's physical and neurological examinations were normal. Dr. Gualtieri noted that *Page 16 
plaintiff's speech was fluent and articulate and that plaintiff had no overt conversation, memory, or attention problems.
54. Dr. Gualtieri testified that plaintiff's accident resulted in a concussion and a mild injury to the brain. Dr. Gualtieri did not feel plaintiff had the type of brain injury that causes persistent personality changes and that plaintiff likely had a mood disorder that was responsible for his reported angry outbursts. Dr. Gualtieri believed that plaintiff had no permanent impairments from his head injury in December 2004 and that plaintiff would best be treated for a mood disorder by his family physician, Dr. Wilson, and Mr. Jones. Dr. Gualtieri did not think that plaintiff had a conversion disorder. He also opined that plaintiff's psychological problems were not related to the accident. Dr. Gualtieri did not believe that plaintiff is "a faker" or is malingering.
55. Dr. Gualtieri acknowledged that injuries to the left hemisphere of the brain, where plaintiff suffered his injury, could cause aphasia, or word-finding problems. The type of word-finding problems plaintiff suffered are typical of post-concussion syndrome. He stated that if plaintiff is having frequent angry outbursts, "It may be ill-advised to send him back to work until those are brought under control."
56. Dr. Thompson last saw plaintiff on June 14, 2007. In her deposition, Dr. Thompson testified that plaintiff's work-related traumatic brain injury of December 2004 was a significant stressor for him, but that plaintiff has unconsciously exaggerated his symptomatology. Dr. Thompson believed that plaintiff was not consciously misrepresenting his capabilities or symptoms for the following reasons: 1) his scores were not egregiously below the recommended cutoffs for symptom validity and the scores were not so implausibly poor that she could interpret them as unambiguous evidence that he was deliberately feigning impairment; 2) *Page 17 
Dr. Thompson found plaintiff to be credible with respect to his psychological and emotional distress associated with his reported symptom history; and 3) Dr. Thompson perceived that plaintiff consciously would have preferred to be healthy and fully functioning and was embarrassed and distressed by his physical symptoms.
57. Dr. Thompson diagnosed conversion disorder caused primarily by plaintiff's work-related injury of December 2004. She further noted that there is a significant risk that plaintiff may act out aggressively if he felt provoked or threatened. Dr. Thompson testified that plaintiff should remain out of work until he has gained more control over his emotional behavioral issues if a positive and supportive work environment cannot be maintained.
58. Dr. Thompson stated that given the persistence of plaintiff's symptoms more than two years post-injury and given the fact that he had good quality psychiatric and psychological care, it is likely that plaintiff will continue to experience some degree of his conversion disorder symptoms indefinitely. She explained that the symptoms of conversion disorder do not remain consistent and that the severity and nature of the symptoms may vary as a product of time or in response to perceived stress. While Dr. Thompson did not accept everything plaintiff said, she believes that his history is an accurate representation of his perception of his experiences.
59. Dr. Thompson testified that conversion reaction would not cause a person to lie. However, there is a good likelihood that a person with conversion disorder may misinterpret his experiences. Based upon Dr. Thompson's interactions with plaintiff and the results of his PAI, she believed that it is likely that plaintiff may misinterpret at least some aspects of his interactions with other persons. Plaintiff's cognitive impairment may be perceived instead of real. Dr. Thompson stated and the Full Commission finds that plaintiff's conversion disorder is a product of his traumatic brain injury. Dr. Thompson stated that plaintiff's perceived cognitive *Page 18 
impairment is a symptom consistent with his diagnosis of conversion disorder. Further, Dr. Thompson testified that plaintiff does not meet the DSM IV criteria for malingering.
60. On August 8, 2007, plaintiff saw Dr. Volin and asked when she thought he would be able to return to work. Dr. Volin told plaintiff that he could not go back to work at that time and he may never be able to return to work as a result of his anger outbursts.
61. In her deposition, Dr. Volin opined that behavioral dyscontrol disorder or personality change secondary to traumatic brain injury is extremely difficult to control. Medications currently available for this condition do not work well and have many side effects. Accordingly, plaintiff will likely never be able to return to work. Plaintiff's condition is permanent. Dr. Volin also stated that plaintiff will likely be on some medication to control his anger for the rest of his life. According to Dr. Volin, plaintiff's traumatic brain injury caused his behavioral dyscontrol disorder or anger outbursts, which in turn caused his conversion disorder that affects his balance, speech and sight.
62. Dr. Volin felt that even if plaintiff were not showing angry outburst at work, there is evidence that he has had angry outbursts in other areas of his life, so he could be dangerous at work. She also stated that plaintiff's loss of fine motor control is a result of his traumatic brain injury. Plaintiff should not be driving and should only go out into public when accompanied by a family member. She has not instructed him to move out of his home because his family relationships are important to his overall well-being.
63. Dr. Nicholas is a board-certified professor of psychiatry at the UNC Chapel Hill School of Medicine who was present at Dr. Volin's deposition and agreed with Dr. Volin's testimony. Dr. Nicholas agreed that plaintiff's diagnosis is behavioral dyscontrol disorder secondary to his traumatic brain injury of December 2004. He also agreed that plaintiff likely *Page 19 
has a conversion disorder, especially regarding his symptoms since March 6, 2007. Dr. Nicholas believed that plaintiff's primary stressor was his anger outbursts and his fear of injuring someone at home or at work. Dr. Nicolas testified that plaintiff should not have worked at any time since his syncopal incident on March 6, 2007 and that this inability to work is a result of his anger outbursts, attention issues, and cognitive difficulties.
64. Dr. Nicholas believes that plaintiff's conversion syndrome and the symptoms related to it are involuntary. Plaintiff believes that he is telling the truth in so far as he believes the truth to be. Dr. Nicolas stated that even if it is assumed that plaintiff did not assault or want to hurt his co-workers, it would nevertheless be speculative to say that he could work.
65. At the hearing before the Deputy Commissioner, plaintiff testified that he continues to suffer headaches off and on. On some days his head may only hurt once or twice during the day, but on other days, his head hurts all day long. His headaches have never gone away completely. Plaintiff also testified that at no time since January 2005 has he ever stopped losing his temper for any extended period. He felt that the most important factor in his inability to work is his temper. He testified that his temper was worse at the time of the hearing before the Deputy Commissioner than it was before the March 2007 incident. Plaintiff admits that he loses his temper often for no identifiable reason and that he does not know what triggers these outbursts. Sometimes his anger outbursts are limited to yelling and cursing. Other times, he throws things in the house or the yard. Plaintiff did not feel that his temper disabled him prior to March 6, 2007. However, following the March 6, 2007 incident, his temper grew worse to the point that it has disabled him.
66. Plaintiff also has had depth perception problems since his December 21, 2004 head injury. Further, at no time has plaintiff's balance improved to the point it was before his *Page 20 
accident in December 2004. He stated that following the incident of March 6, 2007, he was only able to ambulate very slowly with a four-legged walker. Several weeks after March 6, 2007, he was able to graduate from ambulating with the walker to ambulating with a cane. Several weeks after that, plaintiff was again able to walk without a cane. By the time of the hearing before the Deputy Commissioner on October 4, 2007, plaintiff was able to walk without assistance. However, he was in the habit of watching his feet while he walked. Plaintiff has tripped several times because he lost his balance. Plaintiff does not believe that his balance or his temper have improved to the point where he can safely return to work.
67. Plaintiff also began to suffer anxiety attacks following his head injury. He has gone as long as a month without an anxiety attack. At other times, he has suffered as many as two or three anxiety attacks in a week.
68. Plaintiff testified that after March 6, 2007, he was unable to drive until May or June 2007. As of the hearing before the Deputy Commissioner, plaintiff stated that he continued to avoid driving unless necessary.
69. Plaintiff has never been off all medications since December 21, 2004, except for one occasion when he ran out of medication for only one day. At the time of the hearing before the Deputy Commissioner, plaintiff was taking Seroquel and Celexa.
70. Jennifer Willett, plaintiff's wife, testified that prior to plaintiff's head injury on December 21, 2004, he was easy going. Nevertheless, he could lose his temper when certain buttons were pushed. Mrs. Willett felt that she could predict when plaintiff would lose his temper and could handle him. After December 2004, plaintiff's temper became unpredictable. She testified, "There are no set triggers." Not only is plaintiff's temper unpredictable, but he loses his temper much more frequently than prior to December 2004. His temper flares are now *Page 21 
more intense and violent. Mrs. Willett has been in fear of being struck by plaintiff several times. As a result of his worsening temper, his doctors have increased his medication to the point where he is having difficulty regulating his sleep patterns.
71. Mrs. Willett testified that she avoids letting plaintiff drive, especially when her children are in the car. When she is driving the car, she has difficulty keeping plaintiff's hands away from the horn when someone cuts her off. He has frequent problems with road rage and tries to take control of the car from her.
72. Mrs. Willett believed strongly that plaintiff is not consciously faking his symptoms. Plaintiff sincerely wants to return to work.
73. Ronald Patterson is a well driller who supervised plaintiff's work from February 2004 until December 21, 2004. Mr. Patterson did not have sufficient opportunity to observe plaintiff after his December 2004 accident to comment on any change in plaintiff's personality.
74. John Carlos is a machinist for defendant-employer who was one of plaintiff's supervisors when he returned to the light duty position in the warehouse following his December 2004 injury. Even though plaintiff was somewhat slow in his work and laid down to take a nap once or twice a day as a result of his medication, he was not criticized by defendant-employer. Mr. Carlos denied that plaintiff had physically assaulted him, but he admitted that plaintiff got into heated verbal arguments with him on occasion.
75. Tom Miller testified that on March 6, 2007, plaintiff walked into the warehouse office and told him that he was dizzy and didn't feel good. Mr. Miller did not recall if plaintiff had trouble speaking. Plaintiff sat in a chair with his head down and was very calm and limp. *Page 22 
Mr. Miller and Charles Underwood helped plaintiff walk to the truck. Mr. Miller testified that it was his opinion that the way plaintiff walked was inconsistent with how he expected someone with plaintiff's balance difficulties to act. Mr. Miller took plaintiff to the hospital.
76. Plaintiff had no write ups before he was injured on December 21, 2004. However, plaintiff had several write ups after December 2004. Tom Miller admitted that plaintiff had been written-up for a verbal altercation that occurred while he was working in the warehouse.
77. William Funston helped supervise plaintiff when he was in the field prior to his December 2004 injury. After plaintiff returned to work in 2005, Mr. Funston tried to help find things for plaintiff to do in the warehouse. Mr. Funston had more contact with plaintiff before his accident than after the accident. When asked to describe plaintiff's pre-accident personality, Mr. Funston responded that plaintiff was "like most of them." When asked if he got upset about things, Mr. Funston responded, "No worse than any of the rest of them." Mr. Funston admitted that following his head injury plaintiff had problems with his speech and that he spoke very slowly. When plaintiff returned to work at the warehouse, Mr. Funston noticed that plaintiff continued to have trouble speaking and walking for approximately a month. Mr. Funston never personally witnessed any of plaintiff's verbal altercations.
78. Testimony was also offered by Dr. John Warren, a board certified forensic psychologist. Dr. Warren reviewed plaintiff's medical records but did not examine plaintiff. Dr. Warren opined that plaintiff's head injury was not significant enough to cause a brain injury or personality changes such as the angry outbursts. Dr. Warren did not feel that plaintiff had a conversion disorder or that his psychological problems could be related to the head injury. Dr. Warren testified that given the inconsistencies in plaintiff's reports, his poor effort during the *Page 23 
neuropsychological testing, and the rareness of a true conversion disorder, there was a high suspicion that plaintiff was malingering.
79. The Full Commission gives greater weight to the expert medical opinions of Drs. Parikh, Volin, Gala, Knerr, Thompson, Nicholas and Gaynes than to those of Dr. Gualtieri and Dr. Warren. The Full Commission finds by the greater weight of the medical evidence that plaintiff's compensable head injury of December 21, 2004 directly caused a behavioral dyscontrol disorder, which manifested itself in plaintiff's angry outbursts, uncontrollable temper and anxiety. Further, the Full Commission finds that plaintiff's balance, speech and vision problems were caused by a conversion reaction that was a direct and natural result of his compensable behavioral dyscontrol disorder.
80. As a result of his compensable injury by accident and the resulting behavioral dyscontrol disorder and conversion disorder, plaintiff has been disabled and unable to work at any employment from March 7, 2007 to the present and continuing. Plaintiff was taken out of work during this time by his doctors.
81. Because plaintiff has developed a relationship of trust with the doctors at the UNC Department of Psychiatry and Dr. Karla Thompson, these doctors are the most appropriate physicians to assume the care and treatment of plaintiff's compensable conditions. Plaintiff sought approval of these doctors within a reasonable period of time.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW *Page 24 
1. On December 21, 2004, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer, which resulted in a head injury. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's compensable head injury caused his behavioral dyscontrol disorder, which includes disabling, uncontrollable anger outbursts and anxiety. Plaintiff also developed a conversion reaction initially directly from the compensable head injury and later as a direct and natural result of his compensable behavioral dyscontrol disorder. The conversion reaction manifested itself in symptoms like balance, speech and vision problems. N.C. Gen. Stat. § 97-2(6).
3. The modified jobs provided by defendant-employer following plaintiff's return to work are not an accurate indication of plaintiff's ability to earn wages. Saums v. Raleigh Community Hospital, 346 N.C. 760,487 S.E.2d 746 (1997).
4. As a result of the work-related injury and based upon the medical evidence that he is mentally incapable of work in any employment, plaintiff was totally disabled from work and is entitled to payment by defendants of total disability compensation beginning March 7, 2007 and continuing to the present and until further Order of the Commission. N.C. Gen. Stat. § 97-29; Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. Plaintiff is entitled to payment by defendants of all reasonable and necessary medical expenses incurred by plaintiff as a result of the injury by accident. The approved medical expenses include the treatment by the doctors at the UNC Department of Psychiatry, as well as Dr. Thompson, who are approved as plaintiff's treating physicians. N.C. Gen. Stat. § 97-25.
 *********** *Page 25 
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay plaintiff total disability compensation in the amount of $451.01 per week from March 7, 2007 to the present and continuing until plaintiff returns to work or until further Order of the Commission. Such amount that has accrued shall be paid in a lump sum.
2. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph one of this Award is approved for plaintiff's counsel and shall be paid by defendants as follows: 25% of the lump sum due plaintiff which has accrued to date shall be paid directly to plaintiff's counsel. Thereafter, plaintiff's counsel shall receive every fourth check of all future compensation.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injuries so long as such treatment tends to affect a cure, give relief or lessen plaintiff's disability. The approved expenses shall include continuing treatment of plaintiff as recommended by the UNC Department of Psychiatry and Dr. Thompson, who are approved as plaintiff's treating physicians.
4. Defendants shall pay the costs.
This 22nd day of January, 2009.
S/__________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/__________________ DANNY LEE McDONALD COMMISSIONER
 S/__________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1